IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSE LUIS CARBAJAL,<br><br>        Petitioner,<br><br>v.<br><br>PAUL J. WIMMER, Sheriff of Tooele County, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; BRIAN HENKE, Director of the Salt Lake Field Office of Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; PAMELA BONDI, Attorney General of the United States, in her official capacity; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; SIRCE OWEN, Acting Director for Executive Office of Immigration Review, in her official capacity; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>        Respondents. | **MEMORANDUM DECISION AND ORDER GRANTING PETITION FOR HABEAS CORPUS**<br><br>Case No. 2:26-cv-00093<br><br>Judge Tena Campbell |

Before the court is a petition for habeas corpus filed by Petitioner Jose Luis Carbajal.

(ECF No. 1.)  Mr. Carbajal alleges that he is being unlawfully confined in violation of the

Constitution and laws of the United States.  Specifically, he challenges a revised interpretation of

the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., recently issued by

Respondent the U.S. Department of Homeland Security (DHS) that requires immigration

officials to place millions of people in mandatory detention pending the outcome of removal

proceedings, regardless of how long those individuals have lived in the country, regardless of

whether those individuals have a criminal record, and regardless of whether those individuals

have been found to be a flight risk or a danger to the community.

      The court recently considered the identical legal question in another habeas petition.  See

Tanchez v. Noem, No. 2:25-cv-1150, 2026 WL 125184 (D. Utah Jan. 16, 2026).  In that matter,

the court held that it was unlawful for DHS to detain a noncitizen who had been living in the

United States for several years under the mandatory detention authority of 8 U.S.C. § 1225(b)(2).

Id. at *10.  The court therefore granted the petition and ordered that the petitioner be provided

with a custody redetermination hearing (commonly known as a bond hearing) in front of an

Immigration Judge under the discretionary detention authority of 8 U.S.C. § 1226(a) and its

accompanying regulations.  Id. at *17; see also 8 C.F.R. §§ 1003.19(a) ("Custody and bond

determinations made by [U.S. Immigration and Customs Enforcement (ICE)] pursuant to 8 CFR

part 1236 may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236."),

1236.1(d)(1) (providing that a noncitizen may "request amelioration of the conditions under

which he or she may be released").

      In the government's response to Mr. Carbajal's habeas petition, the Respondents candidly

concede that they cannot meaningfully distinguish Mr. Carbajal's petition from the petition at

issue in Tanchez.  (Gov't Resp. Order to Show Cause, ECF No. 18 at 4.)  Accordingly, the court

grants Mr. Carbajal's petition for the reasons stated in Tanchez.

But the government also notes that, on February 6, 2026, the Fifth Circuit issued a split decision in which two judges found that DHS's revised interpretation of the INA was lawful. Buenrostro-Mendez v. Bondi, No. 25-20496 (5th Cir. Feb. 6, 2026).  Given that the Fifth Circuit is the first Circuit Court to address this issue on a full record,[1] the government asks the court to reconsider its previous decision.  (See Gov't Suppl. Resp., ECF No. 19.)  Due to the importance of the issue, and because the Fifth Circuit majority departs from this court's ruling in Tanchez, the court agrees that it is appropriate to address whether any points discussed in the Buenrostro-Mendez opinion should cause this court to reconsider its holding.  But the court finds that the majority's reasoning is unpersuasive for the following reasons.

First, the court finds that the majority fails to consider the overall structure of the INA and does not analyze several sections of the statute that illuminate the meaning of § 1225.  The majority relies on the expansive language defining "applicant for admission" and elides that term of art with the phrase "seeking admission," thereby holding that applicants for admission can be said to be seeking admission to the United States even years after they have already been living in the country.  See Buenrostro-Mendez, slip op. at 9–14.  In Tanchez, this court agreed that the INA defines "applicant for admission" broadly and noted some ambiguity about whether all applicants for admission can be said to be seeking admission, especially given a separate subsection of § 1225 that refers to noncitizens "who are applicants for admission or otherwise seeking admission …."  8 U.S.C. § 1225(a)(3).  Tanchez, 2026 WL 125184, at *5, *7–8 & n.7.

---

[1] The Seventh Circuit has also considered—and disagreed with—the government's arguments on the statutory issue, but only with the benefit of a preliminary record.  See Castañon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061–62 (7th Cir. 2025) (granting in part and denying in part a request for a stay pending appeal after finding that DHS was unlikely to succeed on the merits of its argument that noncitizens arrested in Chicago without a warrant were subject to mandatory detention under 8 U.S.C. § 1225(b)(2)).

But the court found that this ambiguity was resolved by § 1225(b)(2)'s use of active verbs that "suggest a moment in time when a noncitizen is crossing or has recently crossed a border," as well as the subsection's heading ("Inspection of other aliens") and the fact that the term "inspection" is used elsewhere in the INA in reference to an event that occurs at the border. Id. at *8. The Fifth Circuit majority does not discuss the statute's use of the term "inspection." Indeed, the majority writes that DHS encountered the two petitioners who were the subject of that appeal in 2025, approximately 16 and 24 years after the petitioners had respectively entered the United States, and that, "upon inspection, immigration officers determined that each was inadmissible as an alien present in the United States without having been admitted or paroled." Buenrostro-Mendez, slip op. at 6 (emphasis added). The majority therefore suggests, without further analysis, that inspection can occur decades after entry.

But the majority's assumption has unintended consequences. For instance, given the majority's insistence that the petitioners are applicants for admission who are still "seeking admission" to the United States as that term is used in § 1225(b)(2), the petitioners must also still be "applying for admission to the United States" as that phrase is used in § 1182(d)(5)(A), and therefore eligible to apply for humanitarian or public benefit parole. See Jennings v. Rodriguez, 583 U.S. 281, 288 (2018) (noting that applicants for admission detained under § 1225 may be released on parole under § 1182(d)(5)(A) "for urgent humanitarian reasons or significant public benefit"). And if granted parole, the petitioners would be eligible for adjustment of status under § 1255(a), given that they have now been "inspected and … paroled into the United States."[2] See Tanchez, 2026 WL 125184, at *8. Noncitizens granted humanitarian or public benefit

---

[2] There may be other reasons why petitioners would not qualify for adjustment of status, but fulfilling the inspection requirement removes a large obstacle.

parole also gain several other rights, including work authorization, <u>see</u> 8 C.F.R. § 274a.12(c)(11), a tolling of unlawful presence time, <u>see</u> 8 U.S.C. § 1182(a)(9)(B)(ii), and eligibility for Social Security benefits, <u>see</u> 20 C.F.R. § 416.1618(a), (b)(2).  In contrast, noncitizens granted conditional parole under § 1226(a) are not eligible for these benefits.  Indeed, § 1226(a)(3) expressly prohibits the government from providing a noncitizen granted conditional parole with a work authorization unless the noncitizen is a lawful permanent resident or would otherwise receive such an authorization without regard to removal proceedings.

The Eastern District of Texas has considered the distinct types of parole available under the INA in extensive findings of fact that vacated a DHS rule (the "Keeping Families Together" rule) that would have allowed certain family members of U.S. citizens who had entered the country without inspection to be "paroled in place" under § 1182(d)(5)(A), thereby allowing these individuals to become eligible for adjustment to lawful permanent resident (LPR) status without leaving the country.  <u>Texas v. U.S. Dep't of Homeland Sec.</u>, 756 F. Supp. 3d 310 (E.D. Tex. 2024); Implementation of Keeping Families Together, 89 Fed. Reg. 67,459, 67,460 (Aug. 20, 2024).  After a comprehensive discussion of the history of the INA, including an explanation of how the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009–546, replaced the INA's previous bifurcated framework for exclusion and deportation proceedings with one type of removal proceeding under 8 U.S.C. § 1229a, the court noted that IIRIRA nevertheless maintained the INA's distinct categories for parole:

> [T]he two types of parole under immigration law differ because only one of them is a type of legal entry.  INA § 212(d)(5) [8 U.S.C. § 1182(d)(5)] "parole into the United States" satisfies the legal-entry requirement to adjust to LPR status under INA § 245(a) [8 U.S.C. § 1255(a)] because it is a release with authorization to enter the country.  In contrast, INA § 242(a) "conditional parole" is a release from custody pending any removal proceeding, and <u>thus applies even to aliens detained</u>

<u>after illegally entering the country.</u>  8 U.S.C. § 1226(a). ... If parole other than a lawful entry could satisfy INA § 245(a)'s lawful-entry requirement (absent a special provision deeming or directing that result), then INA § 242(a) parole from custody would also seem to satisfy that requirement.

<u>Texas v. U.S. Dep't of Homeland Sec.</u>, 756 F. Supp. 3d at 355 (emphasis added).[3]  Referencing the "almost-70-year-old INA requirement that generally only noncitizens who <u>came here lawfully</u> may become permanent residents[,]" the court found that noncitizens who entered without inspection were only eligible for the conditional parole provided under § 1226(a).  <u>Id.</u> at 355.  But the corollary of that position is that noncitizens who entered without inspection are also subject to discretionary detention under § 1226(a).  The government's revised position, and the Fifth Circuit's opinion upholding that position (i.e., that § 1225(b)(2) is the controlling detention provision for noncitizens in the interior of the country who entered without inspection), opens up eligibility for humanitarian or public benefit parole under § 1182(d)(5)(A) to a large group of noncitizens to whom the benefits of that parole were previously unavailable.[4]

Complications from DHS's changed position have already arisen in the Eleventh Circuit.  On December 12, 2025, that court heard oral argument in <u>Labrada-Hechavarria v. U.S. Attorney General</u>, a case that concerns whether Cuban nationals who were denied an adjustment to LPR status because they were released on conditional parole under § 1226(a) should nevertheless be granted the benefits of humanitarian or public benefit parole under § 1182(d)(5)(A) (such as

---

[3] The opinion references the pre-IIRIRA version of INA § 242(a) which contained the conditional parole and bond provisions now codified at 8 U.S.C. § 1226(a).  <u>Compare</u> 8 U.S.C. § 1152(a) (1994), <u>with</u> <u>id.</u> § 1226(a).

[4] Even if the government does not intend to grant humanitarian or public benefit parole to any of the noncitizens it is currently detaining under § 1225(b)(2), future administrations may adopt a different position.  <u>See</u> <u>Biden v. Texas</u>, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring) ("Notably, every Administration beginning in the late 1990s has relied heavily on the [§ 1182(d)(5)(A)] parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden.").

eligibility for adjustment of status) given the government's assertion that, as a matter of law, their detention should have occurred under § 1225(b)(2). During argument, the court noted that the situation created by the government's changed policy was a "mess" and stated: "You can't have your cake and split it up in two ways so that you get the good side of it and not the bad side of it. You can't get the mandatory detention that the administration wants for almost all aliens and deny a class of aliens that you [released under a different section of the INA] the benefits of that severe scheme."[5]

This court's holding in Tanchez that the procedures and requirements of § 1225 are directed at the border context avoids the creation of a legal morass related to parole eligibility. Under the court's interpretation of the statute, noncitizens apprehended at the border are subject to mandatory detention but may apply for humanitarian or public interest parole. In contrast, noncitizens apprehended in the interior are subject to discretionary detention but may be released only on conditional parole. Immigration officials may have some discretion about which statute applies when they arrest a noncitizen who is near the border. See, e.g., Matter of Q. Li, 29 I. & N. Dec. 66 (BIA 2025) (upholding an Immigration Judge's determination that a noncitizen was detained under § 1225(b)(2) and therefore ineligible for a bond hearing where immigration officials encountered the noncitizen within 100 yards of the border and approximately 5.4 miles from a designated port of entry). Indeed, this court noted in Tanchez that Congress likely adopted a broad definition of "applicants for admission" in § 1225 precisely to provide border officials with this kind of flexibility: "If § 1225(b)(2) were restricted to 'arriving aliens' rather than 'applicants for admission,' then [U.S. Customs and Border Protection] might not be able to

---

[5] Oral Argument at 18:01, 19:21, Labrada-Hechavarria v. U.S. Att'y Gen., No. 23-13664 (11th Cir. Dec. 12, 2025), available at: https://www.courtlistener.com/audio/101807/irela-labrada-hechavarria-v-us-attorney-general-consolidated-with/.

establish that certain noncitizens, even if they were encountered near the border, qualified as 'arriving aliens' due to difficulties proving the date of entry." <u>Tanchez</u>, 2026 WL 125184, at *7. But while some discretion and overlap of the statutory provisions may exist at the border, the court finds that § 1226 is the controlling section outside the border context.

Because the Fifth Circuit majority does not address the INA's provisions concerning parole, the majority assumes that detention under § 1226(a) is necessarily preferable to detention under § 1225(b)(2). <u>See</u> <u>Buenrostro-Mendez</u>, slip op. at 20 n.15 (referring to discretionary detention as "one of the most significant advantages available for unlawful entrants"). And because the majority notes that a "predominant goal" in the enactment of IIRIRA was "to reduce the disparity between lawful and unlawful applicants for admission[,]" the majority finds that Congress must have intended that all applicants for admission who cannot establish admissibility beyond doubt be detained without the possibility of release on bond. <u>Buenrostro-Mendez</u>, slip op. at 20 & n.15. But for the reasons stated above, the detention schemes under § 1225 and § 1226 are distinct, with different advantages and disadvantages. This court therefore disagrees that, by receiving a bond hearing and potential release under the restrictions of § 1226(a), noncitizens who entered without inspection are unfairly advantaged compared to noncitizens who apply for entry at the border.

In any event, the court notes that a bond hearing is a separate matter from a noncitizen's removal proceeding. <u>See</u> 8 C.F.R. § 1003.19(d) (noting that an Immigration Judge's consideration of requests for "custody or bond … shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding"). And as the court previously noted, "IIRIRA did place noncitizens charged with inadmissibility, whether at a port of entry or within the country, on equal footing concerning the procedures and the burden of

proof in removal proceedings." <u>Tanchez</u>, 2026 WL 125184, at *11.  The framework enacted by IIRIRA requires that an applicant for admission, regardless of physical presence, must prove either "clearly and beyond doubt" that they are entitled to be admitted or, "by clear and convincing evidence," that they are lawfully present in the United States due to a prior admission.  8 U.S.C. § 1229a(c)(2).  In contrast, in the case of a noncitizen who has been lawfully admitted but is charged with deportability, it is the DHS who has the burden of establishing "by clear and convincing evidence" that the noncitizen is deportable.  <u>Id.</u> § 1229a(c)(3).  Accordingly, the court's interpretation of the statute does not contradict Congress's intent to reduce the disparity between applicants for admission who present themselves at the border and those who evade inspection.  Rather, the court's ruling preserves Congressional intent by maintaining a distinction between the various types of parole available under the INA.

Moreover, the court agrees with the Honorable Dana M. Douglas, who dissented from the Fifth Circuit's majority opinion, that there are good reasons that Congress would wish to provide noncitizens who have been living in the country with a bond hearing—namely, that "government intrusions have always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business without having to show that they are 'clearly and beyond doubt entitled to be admitted' if taken, or mistaken, for an otherwise inadmissible noncitizen …."  <u>Buenrostro-Mendez</u>, slip op. at 42 (Douglas, J., dissenting) (quoting 8 U.S.C. § 1225(b)(2)(A)).  This court also noted in <u>Tanchez</u>:

> [N]oncitizens who have lived for years in this country are more likely to be working in critical industries, parenting U.S. citizen children, or otherwise serving their communities.  The mass detention of these individuals—without regard to flight risk or danger to the public—is far more disruptive to local American economies, families, and communities than the detention of noncitizens who have just crossed the border.

Tanchez, 2026 WL 125184, at *11) (quoting Rodriguez v. Bostock, No. 3:25-cv-5240-TMC, 2025 WL 2782499, at *24 (W.D. Wash. Sept. 30, 2025) (cleaned up)).

Having analyzed the statutory language, the court finds that its interpretation of the INA is more congruent with the statute as a whole than the interpretation suggested by the Fifth Circuit. But the court has also considered the additional support from legislative history and Supreme Court opinions that the Fifth Circuit majority cites to bolster its holding. Nevertheless, the court finds that this additional support is equally unpersuasive.

For instance, the court is unconvinced by the majority's discussion of the Supreme Court's opinion in Jennings v. Rodriguez. See Buenrostro-Mendez, slip op. at 15–17. This court has also discussed Jennings and found that the Supreme Court's descriptions of sections 1225 and 1226 were not dispositive of the question presented by the habeas petition. Tanchez, 2026 WL 125184, at *13. But this court found that the Supreme Court's decision in Department of Homeland Security v. Thuraissigiam, a case that the Fifth Circuit majority does not address, provided more insight:

> [In Thuraissigiam], the Court held that § 1252(e)(2), which limits additional administrative review of an asylum seeker's credible fear of persecution claim, did not violate either the Suspension Clause or the Due Process Clause. 591 U.S. 103, 140–41 (2020). The Court noted that the asylum seeker in that case did not contest his detention during the pendency of his asylum review because it was undisputed that "he was apprehended in the very act of attempting to enter this country" and that he was inadmissible because he lacked an entry document. Id. at 118–19. In support of the asylum seeker's inadmissibility, the Court cited §§ 1182(a)(7) (the inadmissibility provision for lack of entry documents) and 1225(b)(1) (the expedited removal provision). Id. But the Court went on to state that "simply releasing him would not provide the right to stay in the country that his petition ultimately seeks. Without a change in status, he would remain subject to arrest, detention, and removal." Id. at 119. In support of this statement, the Court did not cite § 1225(b)(2), even though it was clear that the asylum seeker was inadmissible without a change in status. Instead, the Court cited § 1226(a). Id. In other words, the Court understood that an asylum seeker who had not been admitted to the United States and who was subject to the detention provisions of

10

§ 1225(b) at the border would nevertheless be subject to arrest and detention
under § 1226(a) if he were released into the country with no change in status.

Tanchez, 2026 WL 125184, at *13.

The Fifth Circuit's discussion of legislative history is equally unpersuasive. For instance, the majority cites the first and last sentences from a passage in the Federal Register that was produced in response to the enactment of IIRIRA. Buenrostro-Mendez, slip op. at 18. In full, that passage reads as follows:

> The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The Service exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. This interim rule amends the regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination.

Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). The majority then states that the passage, especially the last sentence, "appears to concede that unadmitted aliens fell literally within the scope of § 1225, even though other parts of the newly implemented regulations contemplated granting these aliens the possibility of release on bond." Buenrostro-Mendez, slip op. at 18. While the court agrees that noncitizens who have not been admitted fall within the broad definition of an "applicant for admission" contained in § 1225, the cited passage confirms that Congress intended for noncitizens who have not committed crimes and who "are present" in the country to continue to be eligible for bond and bond redetermination hearings. The passage therefore supports an inference that is contrary to the observation made by the majority.

11

Other aspects of the legislative history cited by the majority provide even more compelling evidence that Congress did not intend § 1225(b)(2) to apply to noncitizens detained in the interior of the country.  As noted in the passage above, the Attorney General[6] exercised the option to delay implementation of the mandatory detention requirements in § 1226(c).  The Fifth Circuit provides more detail about the reasons for this delay:

> When Congress passed IIRIRA, it estimated that the detention mandate in § 1226(c) would require the detention of 45,000 new immigrants.  See H.R. Rep. No. 104-469, pt. 1 at 118, 120, 123 (1996).  Supposedly because Congress was worried about insufficient detention capacity, it included a provision that permitted delaying implementation of § 1226(c) for two years.  IIRIRA § 303(b), 110 Stat. 3009-586 to 3009-587.  IIRIRA did not include a similar provision for § 1225(b)(2)(A), even though, under the government's interpretation, § 1225(b)(2)(A) would require the detention of far more than 45,000 aliens.  See H.R. Rep. No. 104-469, pt. 1, at 111 (estimating that about two million aliens who had entered without inspection were present in the United States around IIRIRA's enactment in 1996).

Buenrostro-Mendez, slip op. at 19.  The majority then suggests that it cannot speculate about why Congress did not provide a similar delay for the implementation of a far larger detention mandate.  Id. at 20.  But the majority concludes that it is not the court's job to rewrite statutory text.  Id.

This court agrees that the judiciary must not rewrite a Congressional Act, but the far simpler explanation for Congress's failure to provide a provision delaying implementation for the detention of millions of people is that Congress did not intend for such detention to occur.  No revision of the statute is necessary to demonstrate that intent: section 1226 applies to noncitizens detained within the country, whereas the text and structure of § 1225 support the inference that it is a provision aimed at the border.

---

[6] After the creation of the Department of Homeland Security, certain authority granted to the Attorney General under the INA was transferred to the Secretary of Homeland Security.  See 8 U.S.C. § 1103(a)(1).

The Fifth Circuit majority does cite two points that are somewhat more persuasive.  First, the majority notes that a regulatory provision passed in 1997 mirrors the government's current interpretation of the statute:

> An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act [8 U.S.C. § 1225(b)(2)] for a proceeding under section 240 of the Act [8 U.S.C. § 1229a].

8 C.F.R. § 235.3(b)(1)(ii).  But this text appears in regulations related to expedited removal, see id. § 235.3(b), and specifically applies to "the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act[,]" id. § 235.3(b)(1)—in other words, to noncitizens charged with misrepresentation or lack of valid documents under sections 1182(a)(6)(C) and (7).  It is unclear whether this regulation also applies to noncitizens charged with inadmissibility for being present in the United States without having been admitted or paroled.  See 8 U.S.C. § 1182(a)(6)(A)(i).  The court therefore finds that the application of this regulation is limited.

Second, the majority provides at least one answer to this court's concern that the government's interpretation of § 1225(b)(2) renders superfluous some of the provisions of § 1226(c), which require mandatory detention for noncitizens charged or convicted of certain crimes.  As this court noted,

> the § 1226(c) mandatory detention requirement applies both to certain deportable noncitizens (see 8 U.S.C. §§ 1226(c)(1)(B), (C), (D)) and to certain inadmissible noncitizens (see id. §§ 1226(c)(1)(A), (D)).  If Congress had intended § 1225(b)(2) to apply to all noncitizens who had not been admitted, regardless of whether they were detained at the border, then there would have been no need to again specify mandatory detention for certain categories of inadmissible noncitizens (but not others) under § 1226(c).

13

Tanchez, 2026 WL 125184, at \*9.  The Fifth Circuit majority responds that § 1226(c) does work

independently of § 1225(b)(2) because § 1226(c) "eliminates the option of parole for those to

whom it applies."  Buenrostro-Mendez, slip op. at 15.  Although the majority does not

distinguish between conditional parole and humanitarian or public benefit parole parole, the

majority does at least identify one reason why § 1226(c) includes considerations about

inadmissible noncitizens—even though it would have been more logical for Congress to clarify

that these provisions applied to noncitizens who had been released on parole under

§ 1182(d)(5)(A) as well as noncitizens released on conditional parole under § 1226(a).

But the majority is unable to provide a satisfactory answer to this court's observation that

the government's interpretation of § 1225(b)(2) is in tension with the Laken Riley Act, Pub. L.

No. 119-1, 139 Stat. 3 (2025):

> [T]he Laken Riley Act added § 1226(c)(1)(E), which mandates detention for
> noncitizens who are inadmissible under §§ 1182(a)(6)(A), (a)(6)(C), or (a)(7) and
> who have been charged with, arrested for, or convicted of certain crimes.  The
> clear implication of this rule is that mandatory detention does not apply to
> someone who is charged with inadmissibility under the relevant provisions but
> not with the requisite crimes.

Tanchez, 2026 WL 126184, at \*9.  The Fifth Circuit responds as follows:

> As for the Laken Riley Act, Congress passed the Act at a time when the Executive
> was still declining to exercise its full enforcement authority under the INA.
> Accordingly, the Act did have a substantial effect when passed insofar as it
> required the detention without bond or parole of certain aliens the administration
> was then treating as bond-eligible.

Buenrostro-Mendez, slip op. at 15.  But whether the Act had some effect does not explain why

Congress effectively ratified the existing agency practice by amending § 1226 rather than

amending § 1225 to clarify that Congress had always intended all noncitizens who entered

without inspection to be subject to mandatory detention.  To the extent that DHS has not been

complying with the law for the past 30 years, Congress has been extremely silent about its

14

disapproval.  And even the Fifth Circuit—who politely suggests that previous administrations were simply "declining to exercise [their] full enforcement authority under the INA"—is unwilling to acknowledge that the current administration's interpretation of § 1225(b)(2) implies that the executive branch has been acting unlawfully for three decades.[7]

Finally, the court notes that the Fifth Circuit's decision focuses solely on what the INA requires.  The opinion does not address whether its interpretation of the statute is permissible under the Constitution.  But this court has held that the government's revised interpretation of § 1225(b)(2) raises significant constitutional objections.  Tanchez, 2025 WL 125184, at *14–16. Indeed, the court shares the concerns about "the largest detention initiative in American history" that Judge Douglas expresses in her dissent.  Buenrostro-Mendez, slip op. at 23.  Specifically, Judge Douglas notes that,

> with only a little imagination, the government's and the majority's reading means that anyone present in this country at any time must carry the precise kinds of identification they would otherwise have only carried to the border for international travel, lest they be mistaken for an inadmissible noncitizen "seeking admission" into the country.  The majority seems to be unable to imagine what it might mean to be detained within the United States without the appropriate proof of admissibility, and, without a bond hearing, to require the services of a federal

---

[7] In another context, the Supreme Court declined to address whether the executive branch could validly refuse to fulfill the mandatory detention provision of § 1225(b)(2) as a matter of prosecutorial discretion.  See Biden v. Texas, 597 U.S. at 803 n.5 ("We need not and do not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision.").  But given the express availability of parole under § 1182(d)(5)(A) and a statutory provision allowing the executive to return a noncitizen to a contiguous territory pending a removal proceeding, see 8 U.S.C. § 1225(b)(2)(C), it is much more arguable that Congress granted the executive a measure of discretion concerning detention at the border.  The court finds little statutory support for the suggestion that Congress granted the executive similar discretion to pick and choose between the application of § 1225(b)(2) and § 1226(a) to noncitizens in the interior of the country.  Either the government is correct in its revised interpretation of the INA, and its past practice has flouted Congressional intent for three decades, or its revised interpretation of the statute is incorrect, and the government is acting contrary to Congressional intent now.

habeas corpus lawyer to show that one is entitled to release and deserves to see the outside of a detention center again.

Id. at 42.  As this court previously noted, the extension of § 1225(b)(2) to all noncitizens who entered the country without inspection "is in tension with the application of the Fourth Amendment within the country's interior, which 'requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrest must be based on probable cause, and officers must not employ excessive force.' Trump v. Illinois, 607 U.S. —, n.4 (2025) (Kavanaugh, J., concurring)." Tanchez, 2026 WL 125184, at *16.  The Fifth Circuit majority fails to address these constitutional concerns.

What the Fifth Circuit opinion does demonstrate is that this issue will likely remain unsettled while it is taken up by other Circuit Courts and, perhaps, the Supreme Court.  The end result may be that a higher court overturns this court's ruling.  But if this court has gotten the law wrong, its error will have resulted in a handful of immigrants being allowed to remain free from detention on bond pending a final decision in their removal proceedings after a determination that they do not pose a flight risk or a danger to the community—in other words, a result that merely extends the status quo from the past three decades.  If, however, other courts eventually determine that it is DHS who has gotten the law wrong, then the agency will have unlawfully detained tens of thousands, if not hundreds of thousands, of people.

This court does not lightly overturn executive action as unlawful, but the executive branch must faithfully execute the laws as Congress has written them, and not as the executive branch wishes those laws to be.  "And '[i]t is emphatically the province and duty of the judicial department'—not DHS or ICE or the executive branch in general—'to say what the law is.'" Barco Mercado v. Francis, No. 2:25-cv-6582, 2025 WL 3295903, at *2 (S.D.N.Y. Nov. 26, 2025) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (Marshall, C.J.)).

Having carefully considered the Fifth Circuit's opinion, the court declines to reconsider its previous holding and continues to find that DHS's revised interpretation of the INA is unlawful.  In so holding, the court joins the vast majority of other judges to have considered the issue.[8]

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      Mr. Carbajal's petition for a writ of habeas corpus (ECF No. 1) is GRANTED.

2.      The Respondents are ORDERED to provide Mr. Carbajal with a bond hearing under 8 U.S.C. § 1226(a) on February 10, 2026, the date on which Mr. Carbajal is currently scheduled for an immigration hearing.

3.      The Respondents are ENJOINED from denying bond to Mr. Carbajal on the basis that he is detained under 8 U.S.C. § 1225(b)(2).

4.      The Respondents are further ORDERED to file a status report by February 11, 2026.  If Mr. Carbajal is granted bond or conditional parole, that report must confirm that Mr. Carbajal has been released from custody within 24 hours after any bond has been posted.  If Mr. Carbajal is not granted bond, the report must state the reasons for that denial.

DATED this 9th day of February, 2026.

BY THE COURT:

Tena Campbell
United States District Judge

---

[8] Compare Buenrostro-Mendez, slip op. at 6 (noting that, as of November 26, 2025, there were 350 judicial decisions finding in favor of habeas petitioners on this issue), with id. at 6 n.2 (listing two counterexamples).